# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Seneca Resources Corporation,      :
                Appellant     :
                               :
         v.                  :    No. 136 C.D. 2020
                               :    ARGUED:  October 13, 2020
City of St. Marys Zoning Hearing Board : 

BEFORE:    HONORABLE ANNE E. COVEY, Judge
                 HONORABLE CHRISTINE FIZZANO CANNON, Judge
                 HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

## <u>OPINION NOT REPORTED</u>

**MEMORANDUM OPINION BY**
**SENIOR JUDGE LEADBETTER**           **FILED:  November 30, 2021**

       Seneca Resources Corporation appeals from the order of the Court of Common Pleas denying Seneca's appeal from a decision of the Zoning Hearing Board (ZHB) of the City of St. Marys, which had dismissed Seneca's substantive validity challenge to City Ordinance No. 296 (Ordinance, Reproduced Record "R.R." at pp. 581a-86a, appended hereto as "Appendix A."[1]).  The Ordinance amended several of the City's Zoning Code provisions respecting oil and natural gas production activities.  This appeal concerns particularly those provisions relating to "unconventional wells" used for hydrofracking.  (Ordinance.)  We affirm in part and reverse in part.

---

[1] Because Seneca challenges several provisions of the Ordinance, for the sake of concision we have attached the Ordinance itself rather than include detailed recitations of the substance of each provision.

**Background**

*Jurisprudential Developments Relating to the Ordinance*

The City Zoning Code was adopted in 2005. In 2012, the St. Marys City Council amended it to allow oil and gas development as a permitted use in every zoning district of the City. [*See* Zoning Code § 459, R.R. at pp. 858a-60a (repealed by Ordinance Section 1.D).] The 2012 ordinance was passed in response to the enactment of what is commonly known as Act 13 of 2012,[2] which preempted the authority of municipalities to zone oil and gas operations and imposed a regime of penalties for municipalities that failed to comply with its requirements. On December 19, 2013, in *Robinson Township v. Pennsylvania Public Utility Commission*, 83 A.3d 901 (Pa. 2013) (*Robinson II*), a plurality of our Supreme Court declared unconstitutional several provisions of Act 13 in whole or in part, relying upon article I, section 27 of the Pennsylvania Constitution, Pa. Const. art. I, § 27 (Environmental Rights Amendment), and remanded that matter to this Court for consideration of the constitutionality of several other provisions of Act 13. On remand, this Court struck as unconstitutional other provisions of Act 13. *Robinson Twp. v. Pa. Pub. Util. Comm'n*, 96 A.3d 1104 (Pa. Cmwlth. 2014) (*Robinson III*). The sum effect of *Robinson II*, *Robinson III*, and the Supreme Court's decision in *Robinson Township v. Pennsylvania Public Utility Commission*, 147 A.3d 536 (Pa. 2016) (*Robinson IV*), was to reopen the field of municipal zoning regulation of oil and gas operations.

In response to these ongoing developments in the courts, the City Council established an Oil & Gas Committee, which prepared a draft of what was to become the Ordinance at issue. Seneca expressed its concerns throughout the

---

[2] 58 Pa.C.S. §§ 2301–3504.

2

Committee's and City Council's consideration of the draft ordinance, including in comments at a public hearing by the City Council prior to adoption of the Ordinance. On February 15, 2016, the Ordinance was adopted in its current form.

***The Ordinance***

The provisions challenged by Seneca may be summarized as follows. The Ordinance as adopted distinguishes between "conventional wells" (using only vertical well bores) and "unconventional wells" (using any method other than a vertical well bore). [Ordinance at Section 2 (amending Section 112 of the Zoning Code [relating to definitions]).] Of concern to Seneca are those provisions relating to unconventional wells, which are utilized in the practice of extracting natural gas by hydrofracking, which has become the predominant means of drilling for natural gas.[3] The Ordinance establishes facilities used in the development and operation of unconventional wells—well pads [generally, "the site where drilling activities . . . take place . . . . " (*id.*)], natural gas compression stations, and disposal wells[4]—as special exception uses in the Rural-Conservation (R-C) District [Ordinance at Section 3 (amending Section 200 of the Zoning Code [relating to the R-C District])].

To qualify as a special exception in the R-C District, unconventional wells, disposal wells, and compression stations must meet certain requirements set forth in the new Section 459.1 of the Zoning Code. [Ordinance at Section 5 (adding

---

[3] One of Seneca's witnesses testified on cross-examination that Seneca is not currently drilling conventional wells because "shale has . . . become the preeminent play." (Notes of Testimony "N.T." 37, R.R. 111a.)

[4] "Disposal well" is defined as "a bore hole to be drilled, or an existing well to be used, for the purpose of the injection of any liquid related to oil and gas production and storage, including the disposal of hydraulic fracturing chemicals or brine, but excluding the injection of gas or petroleum for storage purposes." [Ordinance at Section 2 (amending Section 112 [relating to definitions]).]

3

Section 459.1 to the Zoning Code [relating to unconventional wells, disposal wells, and compression stations]).] Among those requirements are various location and siting mandates and limitations. These include a prohibition against the location of well pads, disposal wells, and natural gas compression stations in an area with a population density at the time of application greater than 1,086.07 persons per square mile "as delineated on the population density map for the City . . . issued by the United States Census Bureau, as from time to time amended." (Ordinance at Section 5.1.A.) This Census Bureau map was neither further identified nor provided, either prior or subsequent to enactment of the Ordinance.

The Ordinance also provides for setbacks for structures and equipment used for well pads, disposal wells, and natural gas compression stations, from occupied structures. (Ordinance at Section 5.1.B-E.) "Occupied structures" are defined as any permanent building actually used for occupancy by humans or farm animals and existing sources of potable water serving occupied structures. (Ordinance at Section 2.) The ZHB may reduce setbacks "upon written consent of all neighboring properties directly impacted by the setback reduction. The [ZHB] may require installations of man-made sound barriers in such cases, unless specifically waived by the neighboring property owner." (Ordinance at Section 5.1.H.) Section 5 also includes noise restrictions for well pad sites and compression stations and height limitations. (Ordinance at Section 5.1.G and 5.1.I.)

Section 5 of the Ordinance further requires that an applicant "submit a copy of the plat and any water management plan filed with its well permit application under Section 3211 of [Act 13, 58 Pa.C.S. § 3211]" with accompanying information.

4

(Ordinance at Section 5.2.[5]) For unconventional well pads and disposal well sites, an applicant must submit a traffic control plan. (Ordinance at Section 5.3.) An applicant must submit a permit approval under Act 537, the Pennsylvania Sewage Facilities Act,[6] if employees are to be housed on site. (Ordinance at Section 5.4.) For natural gas compression stations, an applicant must submit a plan with approximate GPS coordinates, a plan for noise abatement, and a proposed schedule for installation and removal of the station. (Ordinance at Section 5.5.)

Section 5.6 of the Ordinance provides that development of a well pad site must follow certain "best practices."[7] (Ordinance at Section 5.6.) These best practices may be excused if the applicant can demonstrate that the practices are unnecessary or inappropriate. Further provisions deal with road construction

---

[5] The accompanying information required is as follows: an overall site plan; "[a] detailed site plan showing well pad location, access roads, property lines, setback lines, [and] names and deed references of adjoining surface land owners"; "[a] description of accessory facilities serving the project"; "Gantt charts for proposed development schedules and site decommissioning projections"; "[t]he site address of the development as determined by the Elk County 911 Emergency Communications System"; "[t]he name, address[,] and telephone number of the applicant's site manager (which information shall be regularly updated by the applicant)"; and "[t]he well permit and well pad identification numbers." [Ordinance at Section 5 (adding Section 459.1.2 to the Zoning Code).]

[6] Act of January 24, 1966, P.L. (1965) 1535, *as amended*, 35 P.S. §§ 750.1 - 750.20a.

[7] These best practices include: centralizing facilities on single sites to minimize disturbances of the natural landscape; designing new roads, when necessary, so that alignments can serve as new trails or public accesses after development ceases; using existing infrastructure alignments when selecting locations for temporary or permanent horizontal infrastructure; using downward facing lighting infrastructure to preserve the dark sky nature of the rural landscape; utilizing native species and random planting in restoring development sites after decommissioning; transporting water to and from site by pipeline as the preferred method where feasible; and posting of site identification signs at the intersection of each access road for an unconventional well pad with public highways. (Ordinance at Section 5.6.)

requirements; the staging of trucks and equipment; and dust control. (Ordinance at Section 5.7.[8])

***Seneca's Validity Challenge***

Seneca filed a timely substantive validity challenge to the Ordinance with the ZHB. The ZHB conducted four public hearings from May to September 2016, at which both Seneca and the City presented testimony and exhibits. Material evidence adduced at the hearings is set forth in the analysis below.

Seneca presented the testimony of two witnesses and several exhibits. Dale Rowekamp, Seneca's vice-president of land and marketing, testified concerning the nature and extent of Seneca's oil and gas interests in the City and how he believed those rights would be affected by the setbacks. Seneca also called Douglas Kepler, vice president of Seneca's environmental engineering group. Kepler was qualified as an expert in natural gas well siting, development, and production activities. Kepler testified about the processes for determining the siting of wells and constructing them.

The City presented the testimony of Paul Fleming, a resident of the City, who lives with his family and pets 3,300 feet away from one of Seneca's unconventional well pads. Fleming testified regarding the noise, traffic, vibration, and light impacts attendant to the construction of the unconventional well near his house.

---

[8] Each access road must be paved for a distance of 100 feet from its intersection with a public highway; the staging of trucks and equipment shall not be done within 500 feet of an occupied structure; and the applicant must maintain continuous dust control on all access roads to prevent a dust nuisance on neighboring properties. (Ordinance at Section 5.7.)

In February 2017, the ZHB issued a decision which found as follows regarding the activities that occur during the construction of a well pad, the duration, and effects of those activities:

a. Construction of access roads and the well pad—56 days; noise and dust from heavy equipment and trucks; 15-20 truck deliveries per hour, back[-]up beepers from construction vehicles.

b. Delivering and setting up drilling rig—5 days; 24 hours a day truck traffic.

c. Drilling of wells—112 days; 24 hours a day; noise from pipe collisions, back[-]up beepers from construction vehicles, high pitched whirling noises, ground vibration.

d. Demobilizing drilling rig—5 days; truck traffic 24 hours a day.

e. Hydraulic fracturing of unconventional wells (Completion) takes 40 days, truck traffic 24 hours a day, 7 days a week.

f. The pounding vibration of the hydraulic fracturing was like being next to a major airport while someone was running a chainsaw.

g. The number of trucks created a traffic problem and safety problem when the trucks were interacting with the school bus traffic.

[ZHB Decision, Finding of Fact "F.F." No. 30 (citations to record omitted)]. These findings represented a synthesis of information adduced during Fleming's and Kepler's testimony and Seneca's Exhibit T, "Typical Well Pad Development Timeline—8 Wells Total." (R.R. at p. 1086a.)

Based on its findings, conclusions of law, and accompanying discussion, the ZHB dismissed Seneca's validity challenge in February 2017. Seneca filed an appeal of the ZHB's decision in March 2017. After much briefing but taking no additional evidence, the trial court issued its discussion and memorandum opinion in December 2019 denying Seneca's appeal.

**Issues**

On appeal, Seneca raises nine issues, which may be stated as follows:

1. The Ordinance creates an unlawful floating zone by reference to the Census Bureau population density map.

2. The Ordinance exceeds the City's authority under the Pennsylvania Municipalities Planning Code (MPC).[9]

3. The Ordinance is preempted in whole or in part by the provisions of Section 3302 of Act 13, 58 Pa.C.S. § 3302.

4. The Ordinance results in a *de facto* taking.

5. The Ordinance violates Seneca's due process rights.

6. The Ordinance is *de facto* exclusionary.

7. The Ordinance results in disparate treatment.

8. The Ordinance is otherwise unreasonable and arbitrary.

9. The Board erred in admitting the City's Exhibits 1 through 7.

---

[9] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-11202.

8

(Seneca Br. at Statement of Questions Presented at pp. 5-6.[10])

**Discussion**

*Unlawful Delegation of Legislative Authority*

We first address the sole issue which we believe merits reversal, that pertaining to the alleged unlawful delegation of legislative authority. Seneca argues that the Ordinance creates what it refers to as an "unlawful floating [] overlay zone" (Seneca Br. at p. 55) through the following provision:

> The well pad, compression station or disposal well shall not be located within any area having a population density at the time of application in excess of 1,086.07 persons per square mile as delineated on the population density map for the City . . . issued by the United States Census Bureau, as from time to time amended.

[Ordinance at Section 5 (amending Section 459.1.1 of the Zoning Code).] Seneca notes that the official zoning map for the City does not reflect this "floating overlay zone" and that the map was not published or presented before or during the adoption of the Ordinance. Seneca argues that the population density map is subject to being amended by the Census Bureau which will, in turn, have the effect of amending the Zoning Ordinance. The ZHB found that the referenced map was not entered into evidence by either party and was not referenced in the testimony and concluded that Seneca had failed to prove that it was unable to access oil and gas interests underneath areas where the population exceeds 1,086.07 persons per square mile. Seneca questions how it can be faulted for not entering into evidence materials that were never published, presented, or made publicly available by the City.

---

[10] For reasons of organization, clarity, and concision, we have reordered and paraphrased the issues.

Under article II, section 1 of the Pennsylvania Constitution, "[t]he legislative power of the Commonwealth shall be vested in a General Assembly." Pa. Const. art. II, § 1. Therefore, "when the General Assembly empowers some other branch or body to act, our jurisprudence requires that the basic policy choices involved in 'legislative power' actually be made by the [l]egislature as constitutionally mandated." *Protz v. Workers' Comp. Appeal Bd. (Derry Area Sch. Dist.)*, 161 A.3d 827, 833 (Pa. 2017) [quoting *Tosto v. Pa. Nursing Home Loan Agency*, 331 A.2d 198, 202 (Pa. 1975)]. This is to ensure that "duly authorized and politically responsible officials make all of the necessary policy decisions, as is their mandate per the electorate," and also "to protect against the arbitrary exercise of unnecessary and uncontrolled discretionary power." *Id.* Although generally forbidding the delegation of legislative power, in some instances the Pennsylvania Constitution permits the General Assembly to assign its authority and discretion to execute and administer a law, with the following limitations. First, the General Assembly must make the basic policy choices, and second, the legislation must include adequate standards to guide and restrain the exercise of the delegated administrative functions. *Id.* This means that "the law must contain some intelligible principle to which the person or body authorized to act is directed to conform." *Id.* A permissible delegation of legislative authority must include concrete measures to channel the delegatee's discretion and safeguards to protect against arbitrary, *ad hoc* decision making—such as a requirement that the delegatee hold hearings, allow for public notice and comment, or explain the grounds for its decision in a reasoned opinion subject to judicial review. *Id.* at 835.

These principles limiting delegation apply equally to a municipality's ability to delegate administrative functions to a third party. *See 425 Prop. Ass'n of*

10

*Alpha Chi Rho, Inc. v. State Coll. Borough Zoning Hearing Bd.*, 223 A.3d 300 (Pa. Cmwlth. 2019); *City of Williamsport Bureau of Codes v. DeRaffele*, 170 A.3d 1270, 1275 (Pa. Cmwlth. 2017). The Supreme Court and this Court have held that neither the General Assembly itself nor those entities to which it has delegated its legislative power may adopt amendments by reference to documents promulgated by third parties, sight unseen, without any of the constitutionally required safeguards. *Protz* (General Assembly could not incorporate standards from most recent edition of guide promulgated by American Medical Association); *DeRaffele* (ordinance could not adopt by reference changes in subsequent edition of maintenance code).

Under Section 601 of the MPC, 53 P.S. § 10601, the General Assembly has assigned the power to legislate zoning to municipalities' governing bodies. Like other delegations of legislative authority, the limitations set forth above apply. *See Southpointe Golf Club, Inc. v. Bd. of Supervisors of Cecil Twp.*, 250 A.3d 495 (Pa. Cmwlth. 2021). In this case, the City seeks to delegate a portion of its legislative authority to amend the Zoning Code to the Census Bureau by referencing a map which is subject to being updated without further action by the City. Alone, this provision of the Ordinance is impermissible. Further troubling is the City's failure to actually publish or present the map at any time prior to or during the adoption of the Ordinance.[11] Together, the delegation of authority and the absent map represent

---

[11] Although it is the improper delegation of legislative authority that forms the basis for the Court's holding on this issue, we find the confusion surrounding the map troubling. At oral argument, the panel inquired about the map and the City made an application for post-argument submission of what it terms the "current population density map" and an explanation from the City's Zoning Officer which explains how to interpret the map. Counsel for the City inquired by email, "[c]an you give me the source of this map? I assume it is downloaded from a website." An email from the Zoning Officer explains that the map supplied was "produced internally in coordination with the [City's] [Geographical Information Systems (GIS)] Department." (Seneca Appl. for Post-Arg. Submission at Attach.)
**(Footnote continued on next page…)**

the sort of arbitrary, *ad hoc* decision making that limitations on delegated authority are meant to prevent. Thus, this provision is unconstitutional under article II, section 1 of the Pennsylvania Constitution.

***Authority under the MPC***

Seneca contends that the MPC does not permit the City to regulate the "fine details" of development and construction conducted upon land—i.e., that the City may regulate the "where" of a use, but not the "how," citing numerous cases in which this Court has made statements invoking a where-versus-how distinction. (Seneca Br. at pp. 22-28.[12]) Stated more specifically, Seneca contends that the impacts the City would regulate, including noise and dust, are only "temporary"— associated with the construction of a well pad rather than what it terms the final, permanent "use," "a producing well pad on a reclaimed pad," which has none of these impacts. The regulation of temporary impacts, Seneca argues, constitutes a regulation of "how" the land is used. (*Id.*) The provisions specifically objected to by Seneca include the location and siting requirements in Section 5 of the Ordinance; the noise standard in Section 5.1.G; the requirement to submit a traffic control plan in Section 5.3; the imposition of "best practices" for development of the well pad site in Section 5.6; the requirement to submit Gantt charts for the proposed

---

Seneca objects to the submission. We agree that the record is closed on appeal and therefore deny the City's application to supplement the substance of the record. Nevertheless, the Court cannot overlook that the map at last produced by the City (1) does not come from the Census Bureau and (2) did not apparently exist until requested from the City's unelected, unaccountable GIS Department.

[12] *Protect PT v. Penn Twp. Zoning Hearing Bd.*, 220 A.3d 1174, 1191 (Pa. Cmwlth. 2019); *Frederick v. Allegheny Twp. Zoning Hearing Bd.*, 196 A.3d 677, 689 (Pa. Cmwlth. 2018); *Gorsline v. Bd. of Supervisors of Fairfield Twp.*, 123 A.3d 1142, 1153 (Pa. Cmwlth. 2015), *rev'd on other grounds*, 186 A.3d 375 (Pa. 2018); *In re Thompson*, 896 A.2d 659, 671 (Pa. Cmwlth. 2006); *Schatz v. New Britain Twp. Zoning Hearing Bd. of Adjustment*, 596 A.2d 294, 298 (Pa. Cmwlth. 1991).

development schedules and site decommissioning projections in Section 5.2.D; and "operational requirements for unconventional well pads" in Section 5.7. (Seneca Br. at pp. 26-27.)

Seneca contends that the testimony of Fleming regarding the impacts associated with the drilling of a well on a Seneca pad 3,300 feet from his home indicated that they were all temporary and ceased once the well was constructed. Seneca asserts that the Board's statement that such impacts would be experienced every time a well is drilled is unsupported, and that there is no evidence that the impacts experienced by Fleming are typical of well pad development or would be experienced by others in the same or similar fashion. Seneca further points to evidence that the activities associated with well pad development represent only 1.7% of the life of a producing well, terming adverse impacts temporary and short-lived, with no noise, dust, odor, traffic, lighting, or glare issues, and that the wells will comply with all operations and performance standards set forth in Section 318 of the City's Zoning Code (R.R. at pp. 768a-70a).

The City responds that Section 603(b) of the MPC permits municipalities to, *inter alia*, "regulate . . . the location, erection, [and] construction . . . of structures." 53 P.S. § 10603(b)(2). The City differentiates the cases cited by Seneca from the instant case and argues that they do not support the proposition that the Ordinance at issue is outside its zoning authority under the MPC. (City Br. at pp. 11-14.)

We do not believe that the City runs afoul of the where-versus-how distinction set forth in the cited cases. To begin, siting and location requirements are, in fact, regulations that fall within the category of "where" regulations. Other provisions Seneca challenges do not dictate how drilling is carried out but mitigate

13

impacts upon the environment and neighboring landowners. Still others merely require the submission of information.

To the extent that the Ordinance does govern how drilling is conducted, as pointed out by the City, the MPC itself authorizes municipalities to regulate the erection and construction of structures. 53 P.S. § 10603(b)(2). Further, none of the cases discussing the where-versus-how distinction set it as a bar to regulation of the "temporary" impacts of a use. Our own research has failed to identify such authority—perhaps because the MPC expressly permits municipalities to regulate such issues under the ambit of erection and construction of structures. In a recent case discussing the where-versus-how distinction, although affirming the trial court's finding that unconventional natural gas development was compatible with the purpose of a resource district on the facts of that case, we questioned "whether impacts from pre-production stages of [unconventional natural gas drilling] can never be taken into consideration in a substantive validity challenge. The better jurisprudential articulation is that impacts from any stage can be taken into consideration by the fact-finder in a substantive validity analysis." *Protect PT v. Penn Twp. Zoning Hearing Bd.*, 220 A.3d 1174, 1191 (Pa. Cmwlth. 2019).

Although we found no abuse of discretion by the fact-finder in *Protect PT* in affording less weight to evidence of temporary impacts in that case, we do not find that standard to be required as a matter of law in all cases. Here, we similarly find no abuse of discretion by the ZHB in the weight it accorded such impacts in this case.[13] The ZHB found that the pre-production phases of unconventional well

---

[13] The ZHB, as the fact-finder in this case, is the ultimate judge of credibility and resolves all conflicts in the evidence, including evidentiary weight. *See Penn St., L.P. v. E. Lampeter Twp. Zoning Hearing Bd.*, 84 A.3d 1114, 1146 (Pa. Cmwlth. 2014). The fact-finder may reject even **(Footnote continued on next page…)**

drilling are eight months in duration, with impacts upon neighboring property owners' welfare during that time. The ZHB relied upon the testimony of Kepler and a graph entered into evidence by Seneca (Seneca Exhibit T, R.R. at p. 1098a), as well as the testimony of a lay witness, Fleming, who had experienced noise, traffic, light, and vibration impacts. Further, given that only two "appraisal" wells have been drilled on the F10-A pad near Fleming's house, that Seneca has plans to drill more wells on that pad (Kepler N.T. June 2, 2016 at p. 30, R.R. at p. 185a), and that a well pad typically has eight to fourteen wells drilled upon it at a given time (Kepler N.T. May 12, 2016 at p. 59, R.R. at p. 131a), the ZHB's inference that such effects are capable of repetition is supported by the record evidence.

*Preemption under Act 13 Claim*

Seneca argues that Section 3302 of Act 13, even after its last sentence was struck by *Robinson III*, 96 A.3d at 1120, preempts the Ordinance because it "accomplish[es] the same purposes" as Chapter 32 of the Act or contains provisions that "impose conditions, requirements or limitations on the same features of oil and gas well operations" regulated by Chapter 32. Seneca argues that several items in the Ordinance run afoul of the remaining effective portion of the preemption provision. Among these arguments are the following: Seneca argues that the various setbacks imposed by Section 5.1 of the Ordinance exceed the well location restrictions imposed by Section 3215(a) of Act 13, 58 Pa.C.S. § 3215(a), and are therefore preempted;[14] that the noise provision in Section 5.1.G is a drilling activity

---

uncontradicted testimony if it finds that testimony lacking in credibility. *Protect PT*, 220 A.3d at 1191.

[14] For this proposition, Seneca cites *Huntley & Huntley, Inc., v. Borough Council of the Borough of Oakmont,* 964 A.2d 855 (Pa. 2009), which interpreted the predecessor of Act 13. However, that was not what *Huntley & Huntley* was about. Although hypothesizing in a footnote **(Footnote continued on next page…)**

15

and therefore preempted; that the required submission of Gantt charts and traffic control plans, adherence to best practices, and operational requirements address the development, construction, and operation of oil and gas wells; and that the purposes of the Ordinance, the protection of the safety and property rights of neighboring persons and the protection of natural resources, are the same as the purposes of Act 13.

However, a review of the provisions complained of by Seneca demonstrates that these restrictions are precisely the ones that the Supreme Court has deemed permissible:

> [M]unicipalities may again, as they did prior to the passage of Act 13, regulate the environmental impact, setback distances, and the siting of oil and gas wells in land districts through local ordinances enacted in accordance with the provisions of the MPC or the Flood Plain Management Act,[15] provided that such ordinances do not impose conditions on the features of well operations which the remaining valid provisions of Act 13 regulate.

*Robinson IV*, 147 A.3d at 566 (footnote added). Notably, Seneca cites no specific provisions in Act 13 that remain in effect after the *Robinson* cases that regulate the same features of well operations regulated by the Ordinance. We therefore affirm with respect to this issue.

---

that "[t]his is not to say that an ordinance would be enforceable to the extent it sought to increase specific setback requirements contained" in the predecessor of Act 13, the Supreme Court immediately went on to state that "[t]he issue here is distinct, however, as it pertains to the permissibility of a zoning-based preclusion of oil and gas wells in residential districts." *Id*. at 864 n.10.

[15] Act of October 4, 1978, P.L. 851, *as amended*, 32 P.S. §§ 679.101-679.601.

*De Facto Taking Analysis*

Seneca next argues that the Ordinance constitutes a taking without compensation under the Fifth Amendment to the United States Constitution, U.S. Const. amend. V, and article I, section 10 of the Pennsylvania Constitution, Pa. Const. art. I, § 10.[16] We find no merit in this assertion. In the first place, Seneca argues that its gas interests in various parcels in the City, which have been severed from the surface rights to most of the same properties, constitute an independent property interest of which it has been deprived. However, our Supreme Court, in a case cited by Seneca, has held that a parcel of property may not be "vertically segmented" for purposes of a regulatory taking analysis, and must be defined to include both the surface and mineral rights, the so called "property as a whole" rule. *Machipongo Land & Coal Co. v. Dep't of Env't Prot.*, 799 A.2d 751, 766 (Pa. 2002).[17] At all events, Seneca did not show that the Ordinance works a taking of "all economically beneficial or productive use" of the acreage for which it owns both the surface and oil and gas rights, *see Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), either in the aggregate or with respect to a specific parcel. Nor has Seneca met its burden under the alternate "*Penn Central*" test:

---

[16] The Fifth Amendment provides that no private property "shall be taken for public use, without just compensation." U.S. Const. amend. V. Article I, section 10 of the Pennsylvania Constitution provides that private property shall not "be taken or applied to public use, without authority of law and without just compensation being first made or secured." Pa. Const. art. I, § 10. The takings clauses of the federal and state constitutions are interpreted using the same standards and framework. *Smith v. Cortes*, 879 A.2d 382, 385 (Pa. Cmwlth. 2005).

[17] Because property is conceptualized as a "bundle" of rights, courts have struggled with what are referred to as "severance" issues in defining the relevant parcel. *See generally Machipongo*, 799 A.2d at 766.

> Where, [however] a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending upon a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action.

*Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) [discussing *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)].

Seneca argues at length that it cannot access most of the oil and gas resources in the acreage impacted by the Ordinance and that the ZHB abused its discretion in finding that the resources under that acreage could be accessed by drilling laterally. However, these assertions are fraught with vagueness: Seneca contends the "*potential*" of an unconventional well pad to extract gas from a large area is dependent upon the ability of the operator to "optimally" site the pad, "***without any restriction on surface use***." [Seneca Br. at p. 40 (emphasis in original).] However, in the very next sentence Seneca acknowledges that the siting and placement of well pads are already subject to numerous factors, including "geology, seismicity, land ownership, location of residents, and statutory, regulatory and permitting requirements designed to protect surface water, groundwater, wetlands, flood plains, air quality, natural resources and other natural features, and to ensure optimal development of natural gas resources." [Seneca Br. at pp. 40-41 (footnote omitted).] Those statutory requirements include setbacks imposed by Act 13. 58 Pa.C.S. § 3215(a). Seneca points to no authority that it has the right to the "potential" of every acre of oil and gas interests it owns or the right to "optimally" site a well pad unfettered by zoning regulation.

While the Ordinance might hypothetically work a taking in a specific factual scenario with respect to a specific parcel of property, we cannot on this record

18

find that the ZHB erred in its findings or abused its discretion in rejecting Seneca's taking analysis.

*Due Process Analysis*

Seneca asserts that the Ordinance is unjustified, unnecessary, and unduly restrictive because Pennsylvania has what Seneca terms "a comprehensive statutory and regulatory program governing all aspects of the development of oil and natural gas resources in Pennsylvania," i.e., Act 13. (Seneca Br. at p. 44.) Seneca further objects to the Ordinance's definition of "occupied structure" for purposes of setbacks, which includes agricultural buildings that house farm animals and hunting cabins,[18] "where people only temporarily reside for short periods of time." (Seneca Br. at p. 46.) Seneca asserts that because "the City cannot demonstrate that the Ordinance is clearly necessary to protect the health, safety, morals or welfare of the people, the [ZHB] erred in concluding that the Ordinance does not violate Seneca's due process rights." (Seneca Br. at 47.)

Our Supreme Court has stated as follows:

> A zoning ordinance is a valid exercise of the police power when it promotes public health, safety or welfare and its regulations are substantially related to the purpose the ordinance purports to serve . . . . In applying that formulation, Pennsylvania courts use a substantive due process analysis which requires a reviewing court to balance the public interest served by the zoning ordinance against the confiscatory or exclusionary impact of regulation on individual rights . . . . The party challenging the constitutionality of certain zoning provisions must establish that they are arbitrary, unreasonable and unrelated to the public health, safety, morals and general welfare . . . . Where their validity is debatable, the legislature's judgment must control . . . .

---

[18] The Ordinance does not specifically address hunting cabins.

19

*Boundary Drive Assocs. v. Shrewsbury Twp. Bd. of Supervisors*, 491 A.2d 86, 90 (Pa. 1985) (internal citations omitted). The balancing test recognizes that the preservation of the *rights* of property owners is tempered by the *obligation* of a property owner to utilize its property in a manner that will not harm others in the use of its property, and zoning ordinances may validly protect the interests of neighboring property owners from harm. *In re Realan Valley Forge Greenes Assocs.*, 838 A.2d 718, 728 (Pa. 2003).

Where a zoning hearing board's findings of fact are supported by substantial evidence, they are binding upon this Court. *Frederick v. Allegheny Twp. Zoning Hearing Bd.*, 196 A.3d 677, 688 (Pa. Cmwlth. 2015). Here, based upon the testimony of Fleming, the ZHB found that the noise, traffic, vibration, and light created by the drilling of an unconventional well are offensive to humans and animals[19] at a distance of 3,300 feet away from an unconventional well pad (ZHB Decision at F.F. Nos. 33-35)—well beyond the distances imposed by the Ordinance's setback requirements. While one may disagree with the weight accorded the testimony of Fleming and the findings derived therefrom—as Seneca strenuously does—we are not free to disregard them. *See Protect PT*, 220 A.3d at 1191 ("[T]he fact-finder [] is the ultimate judge of credibility and resolves all conflicts in the evidence."). The Court also cannot dismiss the seeming legislative determination of the City that a neighboring landowner's right to preserve and enjoy

---

[19] Fleming testified that he owns a dog and a cat, which are not among the farm animals whose habitations are included in the definition of occupied structure. However, Seneca does not challenge the underpinnings of the factual finding that unconventional drilling impacts are offensive to farm animals, asserting instead that protection of farm animals is beyond the authority of the City.

his property, including hunting cabins and farm animals, is worthy of protection. Accordingly, we find no violation of Seneca's right to due process.

***Exclusionary Zoning Analysis***

Seneca argues that the Ordinance is *de facto* exclusionary,[20] claiming that it permits oil and gas development only "under such conditions that the use cannot in fact be accomplished." Seneca further argues that as a consequence of its exclusionary effect, the Ordinance fails to allow reasonable development of oil and gas, in violation of Section 603(i) of the MPC, 53 P.S. § 10603(i), which requires that zoning ordinances provide for "reasonable development of minerals in each municipality."

In a case where an ordinance is alleged to be *de facto* exclusionary, we proceed in two steps: we first consider whether the challenging party has overcome the presumed constitutionality of an ordinance by showing it excludes a use and, second, whether the municipality has salvaged the ordinance by presenting evidence to show that the exclusionary regulation bears a substantial relationship to the public health, safety, morality, or welfare. *Twp. of Exeter v. Zoning Hearing Bd. of Exeter Twp.*, 962 A.2d 653, 661 (Pa. 2009). While Seneca disputes the ZHB's findings respecting the quantum of acreage that it may not utilize for oil and gas extraction under the Ordinance, even assuming *arguendo* Seneca's highest estimate is true, that leaves Seneca with roughly 71% of its acreage in the City accessible for oil and gas

---

[20] An allegation of *de facto* exclusionary zoning is governed by the due process provisions of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, and article I, section 1 of the Pennsylvania Constitution, Pa. Const. art. I, § 1. "Article I[,] [s]ection 1 of the Pennsylvania Constitution protects the citizen's right to the enjoyment of private property, and governmental interference with this right is circumscribed by the due process provisions of the Fifth and Fourteenth Amendments to the United States Constitution." *Hopewell Twp. Bd. of Supervisors v. Golla*, 452 A.2d 1337, 1341 (Pa. 1982) [quoting *Surrick v. Zoning Hearing Bd. of Upper Providence Twp.*, 382 A.2d 105, 107-08 (Pa. 1977)].

development. This is to say nothing of acreage potentially accessible by other owners of oil and gas interests in the City, about which no testimony was presented. Thus, Seneca has failed to demonstrate that oil and gas extraction is excluded.

*Disparate Treatment Analysis*

Seneca argues that the Ordinance runs afoul of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend XIV, § 1, and article III, section 32 of the Pennsylvania Constitution, Pa. Const. art. III, § 32,[21] by denying it equal protection. Specifically, Seneca argues that the Ordinance results in disparate treatment without reasonable basis. Seneca contends that other "similar activities"—construction, road work, farming, timbering, mining, and water well drilling—can also create temporary noise, dust, and other adverse impacts, but are not subject to similar zoning rules. (Seneca Br. at p. 49.) Seneca cites what it sees as the overly broad definition of occupied structure, which does not apply to setbacks for mining, quarrying, and related processing facilities. Seneca states that the ZHB did not cite any evidence as to the origin of the 1,250-foot wellbore setback. Seneca draws a distinction between the Zoning Code's treatment of public utility structures, which are allowed in every zoning district, without setbacks or other restrictions. Seneca identifies the City's wastewater treatment plant as another such facility. Seneca also again cites what it sees as the "end use" of the land, which it compares to a public utility structure and a far less intensive use than the City's wastewater treatment plant.

---

[21] Article III, section 32 of the Pennsylvania Constitution provides as follows: "[t]he General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law." Pa. Const. art. III, § 32. The prohibition against special laws is understood to include principles of equal protection under the law. *Pa. Tpk. Comm'n v. Com.*, 855 A.2d 923, 926 (Pa. Cmwlth. 2004).

22

An ordinance will be deemed to be arbitrary where it is shown that it results in disparate treatment of similar landowners without a reasonable basis for such disparate treatment. *Hopewell Twp. Bd. of Supervisors v. Golla*, 452 A.2d 1337 (Pa. 1982). However, this is not a case like *Hopewell* in which landowners wishing to develop land similarly are being burdened differently. In this case, Seneca's complaint is that owners of oil and gas interests are subject to disparate treatment from landowners engaging in activities *other than* unconventional oil and gas extraction. "Neither the equal protection guarantee of the federal constitution nor the corresponding protection in our state constitution forbids the drawing of distinctions, so long as the distinctions have a rational basis and relate to a legitimate state purpose." *Ligonier Tavern, Inc. v. Workmen's Comp. Appeal Bd. (Walker)*, 714 A.2d 1008, 1011 (Pa. 1998). Once again, we cannot dismiss the ZHB's findings concerning the characteristics attendant to the development of an unconventional well and accessory facilities—or, for this issue, simply substitute our judgment for that of the City Council, particularly on the record with which we are presented.[22]

***Otherwise Unreasonable and Arbitrary Claim***

Seneca argues that the Ordinance is unreasonable and arbitrary because, allegedly, no evidence was presented that the regulation was necessary for the public welfare. (Seneca Br. at p. 52.) Among Seneca's complaints are a lack of "legislative record" supporting the Ordinance; a lack of a "contemporaneous rationale and explanation" in the terms of the Ordinance; a lack of "documents, studies, analysis, or other materials supporting, or otherwise providing a bases [sic] for [] the Ordinance or any of its individual provisions"; and Fleming's testimony supporting

---

[22] Seneca did not present evidence concerning the impacts attendant to mining, quarrying, public utilities, or wastewater facilities. The burden of proof is on the party challenging the ordinance, and where its validity is debatable, it must be upheld. *Penn St., L.P.*, 84 A.3d at 1134.

23

its contention that post-drilling, the use had no noise, dust, odor, traffic, lighting, or glare issues. (Seneca Br. at pp. 52-55.)

Seneca cites no authority for the proposition that a governing body—or any legislative body for that matter—must justify its enactments with a legislative record, a contemporaneous rationale, *etc*. Rather, the argument raised by Seneca inverts the burden of showing that a statute is unreasonable or arbitrary, which lies with the challenging party. *See C & M Devs., Inc. v. Bedminster Twp. Zoning Hearing Bd.*, 820 A.2d 143, 150-51 (Pa. 2002). As such, we reject this argument.

***Admission of City's Exhibits***

Finally, Seneca argues that the ZHB erred by admitting the City's Exhibits Numbers 1 to 7 into evidence and, to the extent it did, considering or relying on them in any way. The ZHB noted in its opinion that it decided to admit exhibits from both the City and Seneca into evidence because in its view the case law and MPC were not clear on how to address exhibits of the type offered—scientific studies and reports regarding drilling operations. (ZHB Decision at Discussion, p. 8.) However, the ZHB noted that it did not consider these exhibits in reaching its decision in this case. *Id.* Therefore, we consider their admission to be of no consequence.

**Remedy**

As we have found only one provision, that relating to the Census Bureau population density map, constitutionally defective, we reach the question of what remedy is appropriate. The ZHB and trial court did not address this question, as they found the entirety of the Ordinance valid. Seneca asks for the reversal of the trial court's and the ZHB's decisions; the City seeks affirmance. Neither addresses

24

the appropriate remedy should only a portion of the Ordinance be determined invalid.

Section 106 of the Zoning Code (relating to validity and severability) (R.R. at p. 596a) provides as follows: "[s]hould any section of [the Zoning Code] be declared by a court of competent jurisdiction to be invalid, such decision shall not affect the validity of this chapter as a whole or of any other part thereof." (*Id.*) "Because the purpose of the severability provision is to salvage, if possible, the remainder of the ordinance if any part of it is declared invalid, such analysis must be undertaken first." *H.R. Miller Co. v. Bd. of Supervisors of Lancaster Twp.*, 605 A.2d 321, 325 (Pa. 1992). As we have stated:

> In general, a statute or ordinance may be partially valid and partially invalid, and if the provisions are distinct and not so interwoven as to be inseparable, the courts should sustain the valid portions. In determining the severability of a statute or ordinance, the legislative intent is of primary significance. The legislating body must have intended that the act or ordinance be separable, and the statute or ordinance must be capable of separation in fact. Thus, the valid portion of the enactment must be independent and complete within itself.

*Pa. Indep. Waste Haulers Ass'n v. Twp. of Lower Merion*, 872 A.2d 224, 228 (Pa. Cmwlth. 2005) (citations omitted); *see also* Section 1925 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1925[23] (relating to constitutional construction of statutes).

---

[23] Section 1925 of the Statutory Construction Act of 1972 provides as follows:

> The provisions of every statute shall be severable. If any provision of any statute or the application thereof to any person or circumstance is held invalid, the remainder of the statute, and the

**(Footnote continued on next page…)**

25

Here, the City Counsel, through Section 106, has expressed its intent that invalid provisions of the Zoning Code be severed. Because the remaining provisions of the Ordinance and Zoning Code, which do not refer to the population density restriction, and are not invalid constitutionally or otherwise, can stand on their own, we strike Section 5.1.A of the Ordinance and allow the balance to remain in force.

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

Judge Crompton did not participate in the decision for this case.

---

application of such provision to other persons or circumstances, shall not be affected thereby, unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

1 Pa.C.S. § 1925. Although the Statutory Construction Act does not apply expressly to ordinances, the principles contained in it are followed in construing an ordinance. *Trojnacki v. Bd. of Supervisors Solebury Twp.*, 842 A.2d 503, 509 (Pa. Cmwlth. 2004).

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Seneca Resources Corporation,    :
                     Appellant    :
                               :
        v.              :    No. 136 C.D. 2020
                               :
City of St. Marys Zoning Hearing Board :

# **O R D E R**

AND NOW, this 30th day of November, 2021, the order of the Court of Common Pleas for the 59th Judicial District, Elk County Branch, is AFFIRMED IN PART and REVERSED IN PART. Section 5.1.A of the Ordinance is hereby STRICKEN. The remainder of the City of St. Marys Ordinance No. 296 shall remain in force.

Further, the City of St. Marys' Application for Post-Argument Submission is DENIED.

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

# APPENDIX A

**CITY OF ST. MARYS**
**Elk County, Pennsylvania**

**ORDINANCE NO. 296**

AMENDING CHAPTER 27 OF THE ST. MARYS CITY CODE, THE CITY OF ST. MARYS ZONING ORDINANCE, REGARDING THE REGULATION OF OIL AND GAS PRODUCTION ACTIVITIES.

ST. MARYS CITY COUNCIL ORDAINS AS FOLLOWS:

SECTION 1. REPEALER.

The following Sections of Chapter 27 of the St. Marys City Code, relating to oil and gas operations, are hereby repealed:

A. The definitions "qualified" and "oil or gas operations" contained in Section 112;

B. Sections 200 (2)(Q), 201 (2)(I), 202 (2)(J), 203 (2)(K), 210 (2)(S), 211 (2)(U), 212 (2)(P), and 220 (2)(X), all relating to the permitted use of qualified oil and gas operations.

C. Sections 200 (4)(H), 210 (15), 211 (4)(D), 212 (17)(A), 220 (4)(C), and 221 (4)(L), all relating to the conditional use of oil and gas operations.

D. Section 459 in its entirety.

SECTION 2. DEFINITIONS.

Section 112 of Chapter 27 of the St. Marys City Code is amended by adding the following definitions:

A. CONVENTIONAL WELL – a bore hole to be drilled for the purpose of or to be used for the production of oil or natural gas, using only a vertical well bore.

B. DISPOSAL WELL – a bore hole to be drilled, or an existing well to be used, for the purpose of the injection of any liquid related to oil or gas production or storage, including the disposal of hydraulic fracturing chemicals or brine, but excluding the injection of gas or petroleum for storage purposes.

C. OCCUPIED STRUCTURE – any permanent building actually used for occupancy by humans or farm animals (cows, horses, pigs, sheep, goats and similar hooved animals and poultry).

D. UNCONVENTIONAL WELL – an oil or gas well to be drilled for the purpose of or to be used for the production of oil or natural gas employing any method of extraction other than a vertical well.

E. WELL PAD – the site where drilling activities for a conventional or unconventional well take place, excluding access roads or pipeline rights-of-way serving the site, as delineated in the applicant's erosion and sedimentation control general permit for earth disturbances issued by the Pennsylvania Department of Environmental Protection, or such larger area as is actually used for drilling activities.

SECTION 3. RURAL-CONSERVATION (R-C) DISTRICT.

Chapter 27, Part 2, Section 200, is amended by adding the following:

A. Section 200 (2), permitted uses:

Q. Conventional Wells, meeting all of the requirements of the Pennsylvania Oil and Gas Act, as from time to time amended.

B. Section 200 (3), special exception uses:

I. Well Pads for Unconventional Wells, meeting all of the applicable requirements of Section 459.1.

J. Natural gas compression stations, meeting all of the requirements of Section 459.1.

K. Disposal Wells, meeting all of the applicable requirements of Section 459.1.

SECTION 4. INDUSTRIAL DISTRICT.

Chapter 27, Part 2, Section 221 (2), relating to permitted uses, is amended by adding the following:

Natural gas processing plants.

C. Well Pads for Unconventional Wells, meeting all of the applicable requirements of Section 459.1.

SECTION 5. REGULATIONS RELATING TO UNCONVENTIONAL WELLS, DISPOSAL WELLS AND COMPRESSION STATIONS

Chapter 27, Part 4, of the City Code is amended by adding Section 459.1 to read as follows:

Section 459.1 Unconventional Wells, Disposal Wells and Compression Stations

Where well pads for unconventional wells, disposal wells or natural gas compression stations are authorized under this Chapter as a special exception use, the proposed use must meet all of the applicable requirements set forth in this Section:

1. Location and site requirements:

   A. The well pad, compression station or disposal well shall not be located within any area having a population density at the time of application in excess of 1,086.07 persons per square mile as delineated on the population density map for the City of St. Marys issued by the United States Census Bureau, as from time to time amended;

   B. No unconventional well bore shall be located closer than 1250 feet to any occupied structure;

   C. No compressor or generator used in the drilling or hydraulic fracturing operations of an unconventional well shall be located closer than 1,000 feet to any occupied structure;

   D. The outer perimeter of the well pad or natural gas compressor station site shall not be closer than 1,000 feet to any occupied structure;

   E. The outer edge of any used water impoundment shall not be located closer than 1,000 feet to any existing source of potable water serving an occupied structure;

   F. The foregoing setback requirements may be reduced if the applicant can demonstrate that the topography surrounding the well pad is such that it provides a natural barrier to noise, dust and other adverse impacts to neighboring property;

   G. The noise level from the well pad site or compression station shall not exceed an average sound level of 65 dbA, or the applicable standard imposed by federal law, whichever is less, measured at the boundary of neighboring properties over the relevant time period established under OSHA regulations for industrial activities in effect at the date application.

   H. Setbacks may be reduced by the Zoning Hearing Board upon written consent of all neighboring properties directly impacted by the setback reduction. The Zoning Hearing Board may require the installation of man-made sound barriers in such cases, unless specifically waived by the neighboring property owner.

   I. Permanent structures on the well pad shall comply with any height restrictions in the Pennsylvania Oil and Gas Act, as from time to time amended, and shall not violate the Airport Safety Zone regulations listed is Section 231 of this Part, unless written approval is received from the City of St. Marys Airport Authority and the Federal Aviation Administration.

583a

2. As part of each application, the applicant shall submit a copy of the plat and any water management plan filed with its well permit application under Section 3211 of the Pennsylvania Oil and Gas Act, 58 Pa.C.S.A. 3211, as from time to time amended. Unless the plat and water management plan contain the following information, the application shall also include:

   A. An overall site plan of the project.

   B. A detailed site plan of the project showing well pad location, access roads, property lines, setback lines, names and deed references of adjoining surface land owners.

   C. A description of accessory facilities serving the project.

   D. Gantt charts for proposed development schedules and site decommissioning projections.

   E. The site address of the development as determined by the Elk County 911 Emergency Communications System.

   F. The name, address and telephone number of the applicant's site manager (which information shall be regularly updated by the applicant).

   G. The well permit and well pad identification numbers.

3. For unconventional well pads and disposal well sites, the applicant shall submit a traffic control plan, which shall include:

   A. All anticipated routes within the City for access to and from the well pad or site;

   B. Proposed schedule of traffic activity serving the well pad or site, including the estimated level and duration of trucking activities;

   C. Where identified by the City or the Department of Transportation, a plan for construction of turning lanes or other traffic control devices to alleviate traffic congestion issues on City or state highways;

   D. A plan for dust control on public highways and nonpublic access roads serving the well pad or site; and,

   E. Installation of signs to discourage or control the use of jake brakes.

4. If employees are to be housed on site, the application shall include evidence of permit approval in compliance with Act 537, the Pennsylvania Sewage Facilities Act.

584a

5. Applications for natural gas compression stations shall include:

   A. A plan showing the location of the station site with approximate GPS coordinates;

   B. A plan for noise abatement; and,

   C. A proposed schedule for installation and removal of the station.

6. Development of the well pad site shall apply the following best practices, unless the applicant can demonstrate that the practices are unnecessary or inappropriate :

   A. Facilities shall be centralized on single sites to minimize disturbances to the natural landscape;

   B. Where new roads are needed, applicants will design alignments that can serve as new trails or public accesses after the development ceases;

   C. Applicants shall use existing infrastructure alignments (streets, rights of way, power and communication corridors, sewer and water easements and railways) when selecting locations for temporary or permanent horizontal infrastructure;

   D. The site shall utilize downward facing lighting infrastructure (except in the case of obstruction lighting), to preserve the dark sky nature of the rural landscape;

   E. In restoring development sites after decommissioning, the utilization of native species is required and a random planting scheme is encouraged.

   F. The transportation of water to and from the site by pipeline is preferred, where feasible.

   G. Site identification signs shall be posted at the intersection of each access road for an unconventional well pad with each public highway.

7. Operational requirements for unconventional well pads and disposal well sites:

   A. Each access road shall be paved for a distance of 100 feet from its intersection with each public highway.

   B. The staging of trucks and equipment shall not be done within 500 feet of any occupied structure;

   C. The applicant shall maintain continuous dust control on all access roads to prevent a dust nuisance on neighboring properties.

8. The procedure for considering a special exception application is set forth in Part 6 of this Chapter.

ADOPTED this 15th day of February, 2016.

CITY OF ST. MARYS

By: _____
Mayor

ATTEST:

_____
Secretary